BILL J. BURTON, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Burton v. Commissioner
Docket Nos. 17437-84; 17438-84; 17804-84; 17850-84; 18139-84; 18140-84; 18141-84; 18152-84; 18219-84; 904-85.
United States Tax Court
T.C. Memo 1989-41; 1989 Tax Ct. Memo LEXIS 59; 56 T.C.M. (CCH) 1164; T.C.M. (RIA) 89041; January 25, 1989. *59 Donald P. Lan and Rockney D. Pletcher, for the petitioners. Val J. Albright and George E. Gasper, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' windfall profit tax for the taxable year 1980 as follows: Petitioners
Deficiency
Bill J. Burton
$  3,905.92
C. E. Jacobs
26,551.54
A. B. Lewis
1,069.21
John H. Burns
1,073.85
Marcia Ungren Foster
1,495.10
Sallie M. Judd
1,073.88
Mozelle F. H. Williams
658.98
Watt R. Matthews
2,291.57
Hazelle O'Fallon
1,495.10
Estate of Joe B. Matthews
Deceased, First National Bank
of Abilene, Executor
1,580.95
After concessions by the parties, the issue for our decision is whether the December 1979 crude oil price bulletin of West Texas Marketing Corporation established the highest posted price for December 31, 1979, for oil produced by petitioners for purposes of section 4989(d)(2). [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The *60 stipulation of facts and exhibits are incorporated by this reference. The principal place of business of the First National Bank of Abilene, executor of the estate of Joe B. Matthews, was Abilene, Texas, at the time it filed the petition on behalf of the estate. The remaining petitioners are individuals who resided in Texas at the time they filed their petitions. Petitioners owned working interests or royalty interests in the following oil properties located in Texas during the taxable year 1980: Oil
Field
Property
Name
County
Dorsey C
Jones County Regular
Jones
Dorsey Estate
Jones County Regular
Jones
Dorsey F
Jones County Regular
Jones
Dorsey G
Jones County Regular
Jones
Hendrick 74-C
Shackelford County Regular
Shackelford
Hendrick 77A
C.E.J. Strawn (5 wells) & Shackelford
County Regular (1 well)
Shackelford
Hendrick G
Wolf Camp (Swastika)
Haskell
Hendrick L
Wolf Camp (Cook S.)
Haskell
Hendrick Y
Shackelford County Regular
Shackelford
Lambs Head
Throckmorton County Regular &
Shackelford County Regular
Throckmorton
Mackay-McCord
McKeichan Strawn
Throckmorton
Matthews PW
Throckmorton County Regular
Throckmorton
Matthews 232
Butterfield Gap-North (Miss)
Throckmorton
Matthews 501
Left Hand (Bend)
Throckmorton
Matthews 68L
Throckmorton County Regular
Throckmorton
Matthews 68P
Throckmorton County Regular
Throckmorton
Matthews 68Q
Throckmorton County Regular
Throckmorton
Matthews 70
W-R-M, North (Caddo) &
W-R-M, North (Miss)
Throckmorton
Matthews 77
Leonards Cap Strawn
Throckmorton
Matthews 78
Taylor Hill (Miss)
Throckmorton
Matthews AB
Throckmorton County Regular
Throckmorton
Matthews JT
Throckmorton County Regular
Throckmorton
Matthews NT
Throckmorton County Regular &
J.W. Slems
Throckmorton
Matthews P
Throckmorton County Regular
Throckmorton
Matthews PA
Throckmorton County Regular
Throckmorton
Matthews Q
Stone Ranch (Tennehill, Lo)
Throckmorton
Matthews QA
Throckmorton County Regular
Throckmorton
Matthews X
Throckmorton County Regular
Throckmorton
Nail 12E
Shackelford County Regular
Shackelford
Tecumseh F
Throckmorton County Regular &
Dugout (Caddo)
Shackelford
Tecumseh H
Throckmorton County Regular &
Dugout (Caddo)
Throckmorton
*61 These counties were located in Texas Railroad Commission District 7B. The Texas Railroad Commission is the state agency that regulates the oil and gas industry in Texas. During the taxable year 1980, C.E. Jacobs Co. was the operator on all of the properties. C.E. Jacobs Co. was owned by petitioner C. E. Jacobs and had its principal place of business in Albany, Texas. The oil produced from the properties was classified as either stripper oil (Tier 2) or newly discovered oil (Tier 3) for windfall profit tax purposes. Tier 2 and Tier 3 were uncontrolled crude oil for price control purposes and could be purchased and sold at market prices. C.E. Jacobs Co. produced and sold 31,677.68 barrels of oil from the properties during December 1979. The oil was sold to Sun Oil Company, Koch Oil Company, and Amoco. None of the oil was sold for more than $ 38 per barrel. In calculating the interim base price under section 4989(d)(2), C.E. Jacobs Co. used $ 39 per barrel as the highest posted price for December 31, 1979, for oil produced by petitioners. Glenn Picquet, an employee of C.E. Jacobs Co., determined the interim base price. He relied upon Crude Oil Price Bulletin No. 79-12 of *62 West Texas Marketing Corporation (WTMC). During 1978 and 1979, the principal activity of WTMC was crude oil trading. Crude oil trading involves purchasing bulk volumes of crude oil for resale, but such purchases do not occur at the lease. During the latter part of 1978, it was decided that WTMC should get into the lease crude purchasing business. This involves the solicitation of producers for the purpose of purchasing their crude oil, and transporting it from the lease to the pipeline. In June 1979, WTMC hired DeWitt Jones as a lease crude representative. As a lease crude representative, Jones solicited the purchases of crude oil from producers. WTMC did not employ any other lease crude representatives in Texas during 1979. In connection with its lease crude purchasing activities, WTMC prepared crude oil price bulletins. The crude oil price bulletin prepared by WTMC for December 1979 provides as follows: CRUDE OIL PRICE BULLETIN 79-12
Effective December 1, 1979 subject to change as prescribed by applicable law and regulations and subject to required certifications, the attached tables presents [sic] the prices and gravity adjustments posted by West Texas Marketing *63 Corporation (WTMC) for purchases of crude oil and condensate. Prices shown are based on the use of 100% tank tables or mutually acceptable automatic measuring equipment with full deduction for basic sediment, water and other impurities and customary adjustment of volume and gravity for temperature. Each seller * * * certifies to WTMC by acceptance of payment that these prices are within the limits which the seller can accept under federal regulations and rulings. In the event it is determined that these prices are in excess of those allowed by applicable regulations, WTMC reserves the right to amend these prices accordingly and to recover any payments made above those allowed. Prices shown are for 40 gravity and above except as noted. They apply to our purchases of Lower Tier, Upper Tier, and Market Priced oil as specified under federal oil price regulations. All prices may be subject to deductions for trucking and other charges where applicable. * * * Uncontrolled oil refers to those categories which are exempt from current D.O.E. ceiling price regulations which currently includes [sic] stripper well, tertiary recovery, and newly discovered crude oils as defined by 10CFR *64 Parts 211 and 212. Table 1
AREA
LOWER
UPPER
MARKET
TIER
TIER
OR UN-
GRAVITY
$ /BBL.
$ /BBL.
CONTROLLED
ESCALATION
Texas
North
6.26
14.00
39.00
B
Panhandle
6.30
14.00
39.00
B
West Central
6.41
14.15
39.00
B
West Texas -
Sour
6.30
13.65
36.00
B
Intermediate
6.41
14.40
39.00
B
To solicit the purchase of crude oil, Jones utilized the Petroleum Information Service. This service, published on a weekly basis, provided a listing of new wells to be drilled in Texas. The listing also included the name of the producer and the county in which the well was to be drilled. Prior to using this service, Jones used the yellow pages to identify potential customers. Jones then contacted the producers in the area by phone and estimated that he made 15 to 20 calls per week. Jones followed up with a form letter and included a copy of WTMC's price bulletin. The form letter served to remind the producer that WTMC had solicited the purchase of the producer's oil. It also contained a listing of notable clients and a banking reference. Jones personally visited those producers who showed significant *65 interest. Jones did not contact all of the producers listed in the Petroleum Information Service but did contact a majority of them. Jones also distributed price bulletins through "cold calls" made to area producers. In addition, price bulletins were sent to existing customers with the monthly run statements. The price bulletins were not published in any newspapers or trade publications. WTMC did not maintain a formal mailing list for purpose of mailing its price bulletins. WTMC first began purchasing oil at wells in September 1979. In September, WTMC purchased at least 1,160 barrels of crude oil, 831 of which were from fields located in Texas Railroad Commission District 7B. In October, WTMC purchased at least 2,028 barrels of crude oil, 1,008 of which were from fields in Texas Railroad Commission District 7B. In November, WTMC purchased 3,740 barrels of crude oil, 3,418 of which were from fields in Texas Railroad Commission District 7B. This oil was not purchased from fields in which petitioners' properties were located. In December 1979, WTMC purchased 13,310.76 barrels of crude oil, 4,733.45 of which were from fields located in Texas Railroad Commission District 7B. *66 The total production of this District during 1979 was 27,873,363 barrels of crude oil. WTMC purchased 320.64 barrels of crude oil from the Shackelford County Regular Field. The total production of this field during 1979 was 748,663 barrels of crude oil. WTMC did not purchase crude oil from any other fields from which petitioners' properties were producing. In the statutory notices of deficiency the Commissioner determined that $ 37.00 per barrel was the highest posted price for December 31, 1979, for oil produced by petitioners for purposes of section 4989(d)(2). OPINION The issue presented is very narrow. We must decide what price petitioners must use in computing their liabilities under the provisions of the Crude Oil Windfall Profit Tax Act of 1980, Pub. L. 96-223, 94 Stat. 229. The computation of the tax liability under the scheme of that legislation is basically to compute the difference between the price that the producer sells the oil (the removal price) and the "adjusted base price" and the severance tax. The "adjusted base price" is defined in sec. 4989 and for the purposes of this case, the only matter in dispute is the proper "base price" to use in computing *67 petitioners' liabilities. The base price, in turn, depends upon the "highest posted price" for crude oil on December 31, 1979. Petitioners used a highest posted price of $ 39.00 per barrel and the Commissioner determined the deficiencies using a highest posted price of $ 37.00 per barrel. The parties do not disagree on the applicable regulations or revenue procedure. Sec. 150.4989-1(c)(8)(i), Temp. Excise Tax Regs., T.D. 7721, 45 Fed. Reg. 64574 (Sept. 30, 1980), provides as follows: (8) Interim rule. (i) This subparagraph applies to oil removed during a month before October 1980. Except as provided in paragraph (c)(8)(ii) of this section, the base prices for tier 2 oil and tier 3 oil, respectively, shall be the product of -- (A) The highest posted price for December 31, 1979, for uncontrolled crude oil of the same grade, quality, and field, or, if there is no such posted price, the highest posted price for such date for uncontrolled crude oil at the nearest domestic field for which prices for oil of the same grade and quality were posted for such date, multiplied by (B) A fraction the denominator of which is $ 35, and the numerator of which is $ 15.20 *68 for purposes of determining base prices of tier 2 oil and $ 16.55 for purposes of determining base prices of tier 3 oil. In determining the base price for tier 2 or tier 3 oil, the grade and quality of the oil produced in December 1979 shall be used. For purposes of determining the highest posted price for December 31, 1979, "posted price" means a written statement of crude oil prices constituting an offer to purchase oil at that price circulated publicly among sellers and buyers of crude oil in a particular field in accordance with historic practices. Although the formality of a printed price bulletin such as is published by major purchasers is not necessary for a price to be a valid posted price, the formality of a publicly circulated written offer is necessary. The requirement that the offer be in writing and publicly circulated eliminates oral offers and offers made only to specified producers. Accordingly, other than the published price bulletins of the type traditionally issued by major oil companies, written offers to purchase constitute a "posted price" only if they are bona fide public offers of general applicability to crude oil producers in the field. For example, *69 a letter from a purchaser to all crude oil producers in a field or in an area would constitute a posted price if the letter was a bona fide offer to purchase from all producers in that field or area. A written contract, of course, would not qualify as a posted price because it represents an agreement between a buyer and specific producer, not a bona fide offer to purchase from all producers. Accordingly, in determining the "highest posted price", a producer should first determine which offers qualify as posted prices for December 31, 1979. Because a posted price must constitute an offer to purchase, an offer does not constitute a posted price for December 31, 1979, unless the offer was initially made on or before December 31, 1979, and was in effect for oil purchased on that date. However, in determining the highest posted price for December 31, 1979, a valid posted price that was adjusted in a subsequent posted price circulated on or before January 14, 1980, shall be considered to be an offer made at the price as adjusted so long as the adjusted price applies to all oil purchased pursuant to the initial offer. In determining which posted prices were applicable to a particular *70 field on December 31, 1979, the term "field" means a general area underlain by one or more reservoirs. Historical field designations commonly used by regulatory agencies and the oil industry will generally be used in the determination of a given field. Price bulletins which specify only a geographical area and crude oil grade (e.g., "West Texas Sour") are presumed to be applicable to every field within the named area, unless a particular field is specifically excluded. However, the existence of a price bulletin stating a higher price for specifically named fields within the same area supersedes the area-wide price bulletin for the named field only. Finally, posted prices do not include either offers to buy at a price not specified in a sum certain (e.g., a price "determined by the purchaser to be competitive") or premiums above posted prices which may have been paid for crude oil purchased on December 31, 1979. Rev. Proc. 81-39, 1981-2 C.B. 596, 603, is consistent with the temporary regulations and the legislative history insofar as it is applicable to the issues presented in this case. Petitioners used the crude oil price bulletin of WTMC as the highest *71 posted price and the Commissioner determined that its use was improper because it was not "publicly circulated" as that term is used in the regulation quoted above. In addition, respondent contends that WTMC was not an oil purchaser of a substantial volume of crude oil in the field. This latter contention of respondent is based upon a requirement found in the temporary regulations but which was not included in the final regulations. Nevertheless, the requirement was contained in a Congressional Committee Report and petitioners do not question its applicability. H. Rept. 96-817 (Conf.) (1980), 1980-3 C.B. 245, 256, contains the following statement: "For a posted price to qualify for use in determining a producer's base price, the price has to be published in writing by a purchaser of a substantial volume of crude oil in the field." Petitioners' oil properties were located in District 7B, as that district is designated by the Texas Railroad Commission. During 1979 WTMC purchased crude oil in that district (in barrels) as follows: September
831.00
October
1,008.00
November
3,418.00
December
4,733.45
Petitioners contend that the purchases set *72 forth above represent a "substantial volume of crude oil in the field" which entitles them to utilize the posted price contained in the price bulletin of WTMC on December 31, 1979. Respondent contends that the volume is not "substantial." Petitioners argue that the purchases are "substantial" just because they are substantial. Respondent compares the purchases with statistics reflecting crude oil production for the entire year 1979. Petitioners strenuously object to respondent's comparisons. Petitioners correctly point out that Congress did not explain the meaning of "substantial." Nevertheless, petitioners argue in the abstract that WTMC purchased a substantial volume of crude oil in 1979. We hold that the test of "substantial volume" must be decided not in the abstract but by means of comparing the volume purchased by WTMC to the total volume of crude oil purchases. We reject petitioners' proposition that the purchases of crude oil by WTMC in 1979 were, per se, "substantial." For purposes of making the necessary comparisons in this case, we will assume that purchases of crude oil can be equated to crude oil produced which presumes that all of the crude oil produced is immediately *73 sold by the producers. We agree with petitioners' objections to respondent's comparisons of the purchases by WTMC in 1979 with various oil production statistics and we reject respondent's comparisons. Petitioners offered no meaningful comparisons. Our examination of the record failed to reveal sufficient evidence of production from which we can conclude that the purchases by WTMC can be held to represent a substantial volume of crude oil. The record is not adequate for purposes of comparing the purchases by WTMC to the total oil produced in the fields where WTMC purchased crude oil. We point out, however, that during all of 1979 WTMC purchased only 9,990.45 barrels of crude oil in District 7B while the total oil production in that district for 1979 was 27,873,363 barrels. In addition, we point out that WTMC purchased 320.64 barrels of crude oil from the Shackelford County Regular Field in 1979 while the total production from that field in 1979 was 748,663 barrels of crude oil. Petitioners have the burden of proof in these cases and they have not offered sufficient evidence from which we can decide whether WTMC purchased substantial volumes of crude oil from the fields from which *74 WTMC purchased crude oil. We, therefore, hold that petitioners were not entitled to rely upon the price bulletin issued by WTMC for December 1979, as the highest posted price of $ 39.00 in computing their liabilities for windfall profit tax. The other ground upon which respondent relied also requires a "quantitative" analysis. Inasmuch as we have held that petitioners were not entitled to rely upon the WTMC price bulletin on the grounds of "substantial volumes of crude oil purchases" we need not decide the other ground determined by respondent. Due to concessions by the parties, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: C. E. Jacobs, docket No. 17438-84; A. B. Lewis, docket No. 17804-84; John H. Burns, docket No. 17850-84; Marcia Ungren Foster, docket No. 18139-84; Sallie M. Judd, docket No. 18140-84; Mozelle F. H. Williams, docket No. 18141-84; Watt R. Matthews, docket No. 18152-84; Hazelle O'Fallon, docket No. 18219-84; and Estate of Joe B. Matthews, Deceased, First National Bank of Abilene, Executor, docket No. 904-85.↩
2. All section numbers refer to the Internal Revenue Code in effect for the taxable year 1980.↩